IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

PATRICIA GARCIA,

        **Plaintiff,**

vs.                                                                                                          **Civil No. 02-800 RLP**

**JO ANNE B. BARNHART, Commissioner**
of the Social Security Administration,

        **Defendant.**

## MEMORANDUM OPINION AND ORDER

**I.**     **Background.**

Plaintiff filed an application for Title XVI disability benefits on March 16, 1992. Benefits were awarded on March 22, 1993, based on lumbar joint and disc disease causing back and left leg pain. In addition, Plaintiff was noted to suffer from dysthymia or depressive disorder. The Administrative Law Judge ("ALJ") found, however, that this mental impairment did not impact her residual functional capacity at that time. (Tr. 262-265).

In November 1999 the Commissioner terminated benefits after determining that Plaintiff was no longer disabled. (Tr. 267-278). Further administrative action amended the date she was considered no long disabled to April 2000. (Tr. 297). Plaintiff requested and received an evidentiary hearing before an ALJ, who determined that her disability had ceased as of April 2000.[1]

Plaintiff appeals the decision to terminate her benefits, asserting four grounds for reversal:

---

[1] The ALJ found that medical improvement had occurred since March 22, 1993, the date of the most recent favorable decision that she was disabled; that this improvement related to Plaintiff's ability to work; that despite continued severe impairments of cervical/thoracic back strain and depression which did not meet or equal a listed impairment, Plaintiff had as of April 2000 the residual functional capacity for a limited range of simple, unskilled, light-level work activity, and that based on the residual functional capacity she was able to perform certain other jobs in the regional and national economy. (Tr. 72-82).

(1) the ALJ failed to make explicit findings in discounting Plaintiff's credibility; (2) the ALJ failed to properly assess Plaintiff's mental impairment and it's impact on her residual functional capacity, (3) the ALJ posed an improper hypothetical to the vocational expert relative to Plaintiff's exertional and nonexertional impairments, and (4) the vocational expert improperly utilized the Employment Statistic Quarterly rather than the Dictionary of Occupational Titles in determining jobs available to Plaintiff.

## II.     Standard of Review.

The Social Security Act provides that final decisions of the Commissioner shall be subject to judicial review. *42 U.S.C. §405(g)*. "The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive. . ." *Id.* I review the Commissioner's decision to determine only whether the decision is supported by substantial evidence and whether correct legal standards were applied. *Glenn v. Shalala*, 21 F.3d 983, 984 (10th Cir. 1994). Substantial evidence is more than a scintilla, but less than a preponderance, and is satisfied by such evidence that a reasonable man might accept to support the conclusion. *Gossett v. Bowen,* 862 F.2d 802, 804 (10th Cir. 1988). The determination of whether substantial evidence supports the Commissioner's decision is not a quantitative exercise, for evidence is not substantial if it is overwhelmed by other evidence or if it constitutes a mere conclusion. *Ray v. Bowen*, 865 F.2d 222, 224 (10th Cir. 1989). I will not reweigh the evidence, but will examine the record as a whole, including whatever in the record fairly detracts from the weight of the Commissioner's decision in order to determine if the decision is supported by substantial evidence. *Glenn*, 21 F.3d at 984.

### A.     Review of Continuing Disability

The Social Security Act provides that the Commissioner shall review disability cases to

determine continuing disability. *42 U.S.C. §416(i)*. Benefits may be terminated if the Commissioner determines that the physical or mental impairments which formed the basis for a prior award of benefits have ceased, do not exist or are no longer disabling. *42 U.S.C. §423(f)*. The Commissioner has promulgated regulations to decide whether disability has terminated. *20 C.F.R. §§404.1588-1599* (Title II)*; 20 C.F.R. §§416.988-998* (Title XVI). This opinion will refer to regulations applicable to termination of Title XVI claims. The regulations provide for termination of benefits if there has been medical improvement in the recipient's impairment that relate to his or her ability to work, and if the recipient is now able to engage in substantial gainful activity. *20 C.F.R. §416.994a*. The regulations define "medical improvement" as:

> . . . any decrease in the medical severity of your impairment(s) which was present at the time of the most recent favorable medical decision that you were disabled or continued to be disabled. A determination that there has been a decrease in medical severity must be based on changes (improvement) in the symptoms, signs and/or laboratory findings associated with your impairment(s).

*20 C.F.R. §416.994(b)(1)(i)*.

### III.     Sequential Evaluation Process Applicable to Termination of Title XVI Benefits.

The regulations provide a seven-step sequential evaluation process for determining whether to terminate benefits under Title XVI. *20 C.F.R. §416.994(b)(5) (i)-(vii)*. If at any point in the process the Commissioner determines there is sufficient evidence to find the claimant is unable to engage in substantial gainful activity, the review may cease. *Id*.

In step one, the Commissioner determines whether the claimant currently has an impairment or combination of impairments which meets or equals the severity of a Listed Impairment. *20 C.F.R. §416.994(b)(5)(i)*. If found to have a listed impairment, the claimant's disability benefits will be continued. *Id*.

3

In step two, the Commissioner determines whether there has been medical improvement in the claimant's condition since the date of the most recent favorable decision. *20 C.F.R. §416.994(b)(5)(ii), §416.994(b)(1)(i)*.

If there has been medical improvement, the Commissioner determines at step three if that improvement is related to the claimant's ability to do work. *20 C.F.R. §994(b)(5)(iii)*. Medical improvement is related to the claimant's ability to do work if there has been "an increase in his or her residual functional capacity based on the impairment(s) that was present at the time of the most favorable medical determination." *Id*.

At step four, the Commissioner determines whether any statutory exception justifies termination of benefits without medical improvement. *20 C.F.R. §416.994(b)(5)(iv)*.

If the exceptions apply, or if the Commissioner determines that medical improvement related to the ability to perform work has occurred, the analysis proceeds to step five, for consideration of whether all of the claimant's current impairments in combination are severe. *20 C.F.R. §416.994(b)(5)(v)*.

If the claimant's current impairments are severe, the Commissioner assesses the claimant's residual functional capacity (RFC) at step six, and determines, considering the claimant's current impairments, whether the claimant can do work he or she performed in the past. *20 C.F.R. §994(b)(5)(vi)*.

At step seven, the Commissioner determines whether the claimant can do other work, considering the claimant's current RFC, age, education and past work experience. *20 C.F.R. §416.994(b)(5)(vii)*.

In termination cases, the Commissioner bears the burden of showing medical improvement

4

by establishing that the claimant's medical condition has improved, the improvement is related to the claimant's ability to work, and the claimant is currently able to engage in substantial gainful activity. *See Glenn*, 21 F.3d at 987 (burden of proof on Commissioner on issue of ability to engage in substantial gainful activity); *see Robbins v. Barnhart*, 205 F.Supp.2d 1189, 1199 (D. Kan. 2002) (burden of proof on Commissioner in termination involving closed period of disability on issues of medical improvement related to claimant's ability to work and ability to engage in substantial gainful activity).

IV. **The Sequential Evaluation Process as Applied to Facts of the Instant Case.[2]**

   A) **Does the claimant have an impairment that meets or equals an impairment listed in Pt. 404, Subpt. P, App. 1 (The Listings).** *20 C.F.R. §416.994(b)(5)(i)*.

The ALJ found that Plaintiff's impairments did not meet or equal a listed impairment. This finding has not been challenged.

   B) **If the claimant does not have a listed impairment, has there been medical improvement since the date of the most recent favorable medical decision.** *20 C.F.R. §416.994(b)(5)(ii)*.

Medical improvement is any decrease in the severity of impairments present at the time of the most recent favorable medical decision, and is based on changes (improvements) in signs, symptoms and/or laboratory findings associated with the impairments. *20 C.F.R. §416.994(b)(1)(i)*.

When initially found disabled, Plaintiff had undergone three surgical procedures: Diskectomy in January 1989; L5/S1 laminectomy, laminotomy, and diskectomy with L4/L5/L5/S1 fusion and placement of stabilizing hardware (plate and screws) and bone graft in August 1989 (Tr. 154-155),

---

[2]Additional steps to the inquiry are required if "exceptions" are present. See 20 C.F.R. §§416.994(b)(3),(4) & (5). As none of these exceptions are present in the instant case, they will not be addressed in this opinion.

and exploration of the fusion site for removal of a loose screw that was irritating a nerve in September 1989. (Tr. 168-170). Despite these surgeries, she continued to suffer from severe low back pain with decreased range of motion of the lumbar spine. She walked with a limp, had positive results on straight leg raising tests as well as numbness and diffuse weakness of the left leg, (see 192, 199, 200, 250, 146-148). As of April 13, 2000, Plaintiff no longer walked with a limp and her range of lumbar motion had significantly improved[3]. Her straight leg raising test, which had reverted to negative, or normal, in 1997 and 1999 (Tr. 557, 498), was inconsistent on April 13, 2000, being positive in the supine position and negative in the seated position. (Tr. 399-405). Based on the foregoing, I find that substantial evidence supports the ALJ finding that medical improvement had occurred since the most recent favorable medical decision.

### C) If there has been medical improvement, is that improvement related to the claimant's ability to work. *20 C.F.R. §416.994(b)(5)(iii).*

For medical improvement to relate to the ability to work, it must result in an increase in the functional capacity to perform basic work activities or residual functional capacity (RFC).[4] *Id.*, *20 C.F.R.§416.994(b)(1)(ii-iv)*; *see 20 C.F.R. §416.945* for a detailed discussion of RFC. The ALJ determined that as of April 2000, Plaintiff was able to perform a limited range of simple, unskilled, light work. (Tr. 79). Plaintiff argues that there is no substantial evidence to support a finding that

---

[3]Flexion or forward bend had improved from 30 degrees to 75 degrees (Compare Tr.147 with Tr. 401, 405). Extension had improved from 5 degrees to "full." (Compare Tr. 147 with Tr. 401). Lateral bend or flexion had increased from 10 degrees to "full." (Compare Tr. 147 with Tr. 401).

[4]The determination of residual functional capacity is an administrative assessment, based upon all of the evidence of how the claimant's impairments and related symptoms affect her ability to perform work related activities. *See Soc. Sec. Rul. 96-5p, 1996 WL 374183*, at *2, *5. The final responsibility for determining residual functional capacity rests with the Commissioner, and because the assessment is made based upon all of the evidence in the record, not only the relevant medical evidence, it is well within the province of the ALJ. *See 20 C.F.R. §§416.927(e)(2); 416.946; 404.45*.

her RFC increased. I find that substantial evidence supports the ALJ's determination that medical improvement resulted in an increase in Plaintiff's RFC.

At the time of the most recent favorable decision, Plaintiff's RFC was "less than the full range of sedentary work (due to) lumbar joint and disc disease" (Tr. 264) which caused severe and debilitating pain. (Tr. 263). Plaintiff's treating doctor, Donald Lacy, D.O., conducted a physical examination on January 28, 1999. That examination was essentially normal, except for a complaint of "sometimes mild back ache . . . and neck ache."[5] (Tr. 391).

Plaintiff was evaluated by Eugene Toner, M.D., an orthopedic surgeon, on April 13, 2000, at the request of the Commissioner. (Tr. 399-405). As reflected in the ALJ's decision, Dr. Toner's evaluation was fairly unremarkable, except for slightly reduced lumbar flexion and hip motion, inconsistent results on straight leg raising test, and non-physiologic numbness and weakness in the muscles of the left leg. (Tr. 76, 400-402). Dr. Toner concluded:

> This claimant may be able to lift up to 20 pounds if she really put her mind to it. She could sit for four hours, stand and walk for 2 hours during the day. I see no reason to restrict the use of her upper extremities at this time.
>
> This claimant is going to school and she may have the potential of being meaningfully employed within the next year if she is able to find work and finishes up her studies. At this point I see nothing physical that would keep her from finishing her studies at this time.

(Tr. 402).

A non-examining physician arrived at conclusions similar to Dr. Toner's based on review of

---

[5]Significant negative findings in Dr. Lacy's examination include: No complaint of fatigue, feels well; No incontinence, or dysuria, voids 0-2/night; neurologically sensations are normal, no speech abnormality, significant headache history or neuralgias; muscles are equal bilaterally in both upper and lower extremities, with no atropy (sic) and good strength for age; joints of the shoulders, wrists, elbows, hand, fingers, hips, knees, ankles, feet and toes are normal in function; no anxiety, sleeping habits normal, no abnormal stresses. (Tr. 391).

the medical record, differing only in the opinion that Plaintiff could sit for six hours per day. (Tr. 406-411).

On June 9, 2000, Plaintiff was seen by Dr. Lacy for allergic rhinitis. She stated that she had stopped drinking and felt "great." She was treated with medication and osteopathic manipulation for ropy, tight muscles in the cervical and thoracic spine, and advised to return in 3-6 months. (Tr. 497). On July 11, 2000, Plaintiff was treated for a vaginal infection. (Tr. 496). Ten days later she was seen for cervical-thoracic spine pain, stating that she had been working hard. (Tr. 495). She returned to Dr. Lacy on September 8, 2000, complaining of neck and upper back pain that had been present for a few weeks. She stated she had had no injury, but had been working hard on making a CD, playing the guitar and singing. Further notes indicate that she was going to promote the CD. (Tr. 494). Plaintiff returned one month later on October 9, 2000. She stated that she felt well, her sleep was normal, she had no complaints of depression, and she exhibited no speech or memory problems. Physical examination again noted ropy, tight cervical and thoracic musculature, but the strength in her upper and lower extremities was normal with no joint abnormalities. (Tr. 492-493). On November 15, 2000, Dr. Lacy signed an "Attending Physicians Supplemental Statement" in which he indicated that Plaintiff was totally disabled from her prior job, due to inability to sit for prolonged periods or to lift due to chronic low back. He also indicated, however, that she was not disabled from performing other work and could perform clerical/administrative (sedentary) activity. ( Tr. 383).

> **D)    If medical improvement is related to the claimant's ability to work, does the claimant still have a "severe" impairment considering in combination all current impairments.** *20 C.F.R. §416.994(b)(5)(v).*

The ALJ found that as of April 2000, Plaintiff continued to suffer from severe physical

8

impairments, but that she exaggerated these impairments. He also found that she did not suffer from a severe mental impairment. (Tr. 79-80). Plaintiff challenges these findings, contending that the ALJ failed to make explicit findings in discounting Plaintiff's credibility and failed to properly assess Plaintiff's mental impairment and its impact on her residual functional capacity.

**(1)  Credibility**

The ALJ is the finder of fact, and his credibility findings, if supported by substantial evidence, will not be overturned. *Diaz v. Secretary of Health & Human Servs.,* 898 F.2d 774,777 (10th Cir. 1990). The ALJ must make express findings as to credibility, which are affirmatively linked to substantial evidence, and not simply conclusions in the guise of findings. *Kepler v. Chater*, 68 F.3d 387, 391 (10th Cir. 1995). The ALJ did so in this case. For example, he compared Plaintiff's testimony as to her incapacity and essentially bed-ridden condition with prior statements she made regarding her activities.[6]  He compared her testimony that she suffered from lack of bowel and bladder control (Tr. 579) with contrary evidence in the medical record.[7]

**(2)  Mental Impairment**

When originally found disabled, Plaintiff had undergone treatment for clinical depression, was involved in domestic disputes with her husband, was addicted to cocaine, and had attempted suicide

---

[6]At her administrative hearing, Plaintiff stated that she attended church on Sunday, then went home to bed; that on a daily basis she had to lay down throughout the day, and sleep sporadically throughout the day. Tr. 574-575, 586. The ALJ compared this testimony to Plaintiff's prior statements that she sang at church and in prisons (Tr.314), did volunteer work at church and detention centers (Tr. 400, 322, 316), was in contact with a recording company (Tr. 384) and planned to travel to New York (Tr. 384); that had written 156 songs (Tr.321), that as of April 2000 was attending school to retrain for a career in a legal profession (Tr. 400, 423), and that as of April 2001 was "singing everywhere she went, including at church as professional games. (Tr.461).

[7]The ALJ noted that Plaintiff made no complaint about bowel or bladder problems to Dr. Toner, and that on numerous visits to Dr. Lacy, Plaintiff denied bladder incontinence or bowel changes. (Tr. 79-80, referring to Tr. 391, 399-405, 487, 489, 490, 492, 495, 498, 504).

on two occasions. (Tr.257, 218, 222-240).

When evaluated by Rene Gonzalez, M.D., a psychiatrist, on June 30, 1999, Plaintiff complained of depression and anxiety of one year's duration, recounted her physical complaints, her use/abuse of alcohol, and stated that she had recently found her boyfriend dead of an overdose of cocaine. Dr. Gonzalez took a detailed history and conducted a mental status examination which disclosed symptoms of depression.[8] He diagnosed Major depression, recurrent episode and alcohol abuse (Axis I), with a present GAF of 50, and past year GAF of 65.[9] He indicated that Plaintiff was of average intelligence, was able remember and understand basic instructions, was emotionally able to hold a job and related well to others. He recommended that she obtain individual and family therapy and initiate treatment with anti-depressive medication. (Tr. 369-372). By April of 2000,

---

[8] "(Ms. Garcia) was cooperative, related well to me. She was able to answer questions appropriately. Her eye contact and psychomotor activities appeared to be mildly decreased. Dressing and grooming appear to be appropriate, and she appeared to be as old has her stated age. Her speech and language intensity appeared to be soft. Pitch and rate appear to be normal. She was coherent. She did not have aphasia, neologism, echolalia, stammering or clanging. Vocabulary and diction appear to be appropriate to social/education/background. Mood appeared to be sad and depressed. Affect appeared to be appropriate to her mood.

"Thinking, form and progression appeared to be normal. Content was showing depressive trends. Concentration and attention appear to be mildly impaired. The claimant was not having suicidal or homicidal ideation. IQ appeared to be average based on verbal skills. The claimant did not appear to have . . . hallucinations. She appeared to be alert, and oriented to person, place, time and situation. Her memory immediate, recent and remote as well as registration appeared to be intact. She was able to repeat a statement. She was able to recall something within five minutes.

"She was able to recall events over the past few days, and long- term history.

"She has insight into her problems. Judgment seems to be normal. She did not appear to have any depersonalization or derealization or any major somatic complaints except for chronic pain, decreased appetite and a little bit of weight loss." (Tr. 370-371).

[9] The GAF scale reports a "clinician's assessment of the individual's overall level of functioning." American Psychiatric Association, *Diagnostic & Statistical Manual of Mental Disorders* 30 (4th ed. 1994). A GAF score of 50 is indicative of serious symptoms or o"serious impairment in social, occupational, or school functioning." *Id*. at 32. A GAF score of 61-70 reflects mild symptoms or "some difficulty" in those areas, but the individual "generally function[s] pretty well." *Id.*

Plaintiff had stopped drinking alcohol and was attending counseling sessions and AA meetings. (Tr. 400).

Plaintiff attended four counseling sessions with Claudia Johnson, a licenced social worker, in the month prior to her administrative hearing. Based on the initial interview Ms. Johnson diagnosed Anxiety Disorder with agoraphobia and major depression, and assigned a GAF of 58.[10] (Tr. 452-459). As of the fourth session on April 13, Ms. Johnson noted Plaintiff was making public signing appearances. (Tr. 461).

The records of care from June 1999 to April 2000, when Plaintiff's disability was found to have ceased, provides substantial support for the ALJ's conclusion that Plaintiff's mental impairment was not severe. On August 24, 1999, Plaintiff was diagnosed with adjustment disorder and anxiety caused by a mugging two weeks earlier. (Tr. 499). She was treated with Zanax. On November 15, 1999, Dr. Lacy signed a disability form stating N/A ("not applicable") with regard to mental or nervous impairment. (Tr. 383). On April 13, 2000, Dr. Toner, based on history, review of medical records and examination, stated that Plaintiff's depression and alcohol abuse was in remission. (Tr. 402). Six months after the date Plaintiff's disability was found to have terminated, Dr. Lacy noted that Plaintiff had no anxiety or depression, and that she had normal sleep.. (Tr. 492).

A non-examining psychologist reviewed and cited to the medical record and determined medical improvement was evident, and that as of April 2000 Plaintiff's mental impairment was not severe. (Tr. 422-429). This opinion is consistent with the evidence cited above.

---

[10]A GAF score of 58 is indicative of moderate symptoms or moderate difficulty in social, occupational, or school functioning." *Diagnostic & Statistical Manual of Mental Disorders* 30 (4th ed. 1994) at 32.

> **E)** **If the claimant's current impairments are "severe," the claimant's current residual functional capacity will be assessed, in order to determine if the claimant can return to work done in the past. If the claimant can return to past work, his or her disability will be found to have ceased.** *20 C.F.R. §416.994(b)(5)(vi).*

The ALJ found that as of April 2000 Plaintiff could not return to her past work. (Tr. 80). The question of what constitutes the relevant period for determining Plaintiff's "current" residual functional capacity is discussed *infra.*

> **F)** **If the claimant can not do work done in the past, residual functional capacity and vocational factors will be evaluated to determine if he or she can do other work. If other work can be performed, the disability will be found to have ended. If it can not, the disability is found to have continued.** *20 C.F.R. §416.994(b)(5)(vii).*

Plaintiff's final claim of error relates to this step of the sequential evaluation process. She contends that the ALJ erred by posing an improper hypothetical to the vocational expert.

The ALJ found that Plaintiff had the RFC for light work limited by certain postural and non-exertional impairments [11] (Tr. 80-81). The record contains two evaluations relative to Plaintiff's RFC for sitting, standing and walking, that of Dr. Toner and that of a non-examining agency physician. Dr. Toner, who specializes in occupational medicine, limited Plaintiff's ability to sit to four hours per day and to stand/walk to two hours per day.[12] (Tr. 432, 402). The non-examining agency physician, whose specialty is unknown, indicated that Plaintiff could sit for six hours in an eight hour day with normal breaks and stand/walk for two hours per day. (Tr. 407). The agency

---

[11]The ALJ's hypothetical questions did not include a sit/stand option, although some of the vocational expert's responses indicated that such an accommodation was included, and apparently the ALJ thought he had included this factor in his questions. (Tr. 594-597, 81)

[12]Under the regulations, a determination that a claimant can perform light work generally means that he or she can also perform sedentary work "unless there are additional limiting factors such as . . . inability to sit for long periods of time." *20 C.F.R. §404.967(b)*. Accordingly, Dr. Toner would impose additional limiting factors which would rule out an RFC for strictly sedentary work.

physician's opinion was based on Dr. Toner's evaluation but provides no explanation for the different conclusions reached. (Tr. 408).

The opinion of an agency physician who has never seen the claimant is generally entitled less weight than that of an examining physician. *See 20 C.F.R. § 416.927(d)(1), (2); Soc. Sec. Ruling 96-6p, 1996 WL 374180, at *2*. If an ALJ intends to rely on a nonexamining source's opinion, he must explain the weight he is giving it. *20 C.F.R. §416.927(f)(2)(ii)*. The ALJ failed to do so.[13] He stated that he concurred with the conclusions of the agency physician, but did not explain why her conclusions were more compelling than those of Dr. Toner. As she did not explain the difference, no explanation can be inferred.

The vocational expert identified five jobs Plaintiff could perform, based on the assumption that she had the RFC to sit for six hours in an eight hour day, and for at least one job identified, would be able to have a sit/stand option. Based on the present record, there is no indication as to whether a limit of four hours of sitting would affect the opinion of the vocational expert. "Testimony elicited by hypothetical questions that do not relate with precision all of a claimant's impairments cannot constitute substantial evidence to support the [Commissioner's] decision." *Hargis v. Sullivan,* 945 F.2d 1482, 1492 (10th Cir. 1991) *quoting Ekeland v. Bowen*, 899 F.2d 719, 724 (8th Cir. 1990). Accordingly, I find that the testimony of the vocational expert does not provide substantial evidence upon which the ALJ could conclude that Plaintiff had the RFC for the jobs identified.

Plaintiff also argues that the hypothetical questions did not take into account her non-

---

[13]Defendant argues that the ALJ was not limited to Dr. Toner's evaluation, could consider the record as a whole in determining Plaintiff's RFC, citing to Plaintiff's school attendance where "she had to sit all day." (Docket No. 13, p. 5). There is nothing in the record to support a finding that Plaintiff's school attendance required her to sit all day, or for any known period.

exertional mental impairments, citing particularly to evidence of mental problems documented in 2001 and her behavior at the administrative hearing. The parties apparently agree that the date of the administrative hearing is the relevant date for determining her current level of impairment.[14] Plaintiff argues that her mental impairment as of that date was not properly factored into the hypothetical questions posed to the vocational expert. Defendant contends that the ALJ properly disregarded her complaints of mental impairment as of that date, which were inconsistent with other evidence of record.

The ALJ referred to April 2000 as the date Plaintiff's disability ceased. (Tr. 73, 77, 79, 80). He discussed the evidence as it related to Plaintiff's mental impairment after that date.(Tr. 76-77, 78, 79-80). In particular, the ALJ noted Plaintiff's sessions with therapist Claudia Johnson, including her signs and symptoms of depression, anxiety with agoraphobia, and initial GAF of 58. I also noted that within a few weeks of therapy Plaintiff was "(singing) everywhere she went, including church and professional games." (Tr. 77). This can reasonably be viewed as improvement in her condition after a very short period, and coupled with the ALJ's discounting of Plaintiff's credibility (See tr. 79-80) provides an adequate basis for the ALJ to find that Plaintiff's mental impairment was not severe. The ALJ was not required to include in his hypothetical questions those assumptions not supported by the

---

[14]Only two circuits have considered the date relevant to the determination of "current" disability in termination cases. The Sixth Circuit, in *Difford v. Secretary of Health & Human Servs.*, 910 F.2d 1316, 1319-1320 (6th Cir. 1990) held that the ALJ must consider the claimant's impairments as of the date of the administrative hearing. In doing so, the ALJ could infer periods of non-disability that might intervene between to periods of disability. *Id.* at 1320. The Seventh Circuit, in *Johnson v. Apfel*, 191 F.3d 770 (7th Cir. 1999), rejected *Difford*. Relying on *Acquiescence Ruling 92-2(6), 1992 WL 425419*, which it found to be well-grounded, the court determined that the term "current" referred to the date of the initial determination that benefits should cease. *Johnson*, 191 F.3d at 774. The court also stated, however, "[i]f the evidence in any way suggests that the claimant may have become disabled again after his disability ceased, the adjudicator will suggest the filing of a new application for benefits." *Id.* at 774-775.

14

record as a whole. *Gay v. Sullivan*, 986 F.2d 1336, 1340 (10th Cir. 1993).  Accordingly, I find that the ALJ did not err in framing the hypothetical question with regard to Plaintiff's mental impairment.

**IT IS HEREBY ORDERED** that Plaintiff's Motion to Reverse or Remand [Docket No. 11] is granted in part.  This matter is remanded to the Commissioner of Social Security with instructions to conduct additional proceedings at step seven of the sequential evaluation process applicable to termination review *20 C.F.R. §416.994(b)(5)(vii)*, to include presenting to a vocational expert, hypothetical questions that relate with precision all of Plaintiff's impairments.

　　　　　　　　　　　　　　　　　　　　　　　　　　_____
　　　　　　　　　　　　　　　　　　　　　　　　　　**Richard L. Puglisi**
　　　　　　　　　　　　　　　　　　　　　　　　　　**United States Magistrate Judge**
　　　　　　　　　　　　　　　　　　　　　　　　　　**(sitting by designation)**